1
2
3
4
5
6

The Honorable Richard A. Jones
Trial Date: January 21, 2020

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9   ARCELIA H. POWERS, a single woman,

NO. 2:18-cv-01883-RAJ

10                         Plaintiff,

WALMART INC.'S MOTION FOR
SUMMARY JUDGMENT

11          v.

12   WALMART, INC., a foreign corporation, dba
MT. VERNON WALMART, Store #2596,

**NOTE ON MOTION CALENDAR:
NOVEMBER 15, 2019**

13                         Defendant.

14

15
16

I. RELIEF REQUESTED

17          Defendant WALMART INC. ("Walmart") seeks dismissal on summary judgment in a

18   case where Plaintiff ARCELIA H. POWERS("Plaintiff") claims to have slipped and fallen as a

19   result of a customer spill on the ground that was demarcated by a bright orange cone, which

20   Plaintiff saw and knew indicated the presence of a spill on the floor.

21

II. STATEMENT OF FACTS

22      1.   Underlying Incident/Plaintiff's Allegations

23          This case arises out of a slip-and-fall incident alleged to have happened at a Walmart

24   store located at 2301 Freeway Drive, Mt. Vernon, Washington, on September 10, 2017 ("Mt.

25   Vernon Walmart") (the "incident"). *See* Declaration of Eddy Silverman, Esq., attached hereto

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

as **Exhibit A** (describing and attesting to exhibits); *see also generally* Complaint for Personal

Injury and Damages ("Complaint"), Dkt. #1 (Exhibit B to Walmart's Notice of Removal).

Plaintiff is alleging, specifically, that she slipped and fell in what is believed to have been baby

food dropped by a customer approximately five minutes prior to the fall at issue.  Ex. A.

The incident happened in the self-checkout area of the Mt. Vernon Walmart, which, at

the time of the incident, was being monitored by Walmart associate Michelle Chytraus.  *See

generally* Chytraus Dep. (select testimony), attached hereto as **Exhibit B**.  Chytraus responded

to the customer drop/spill within approximately 2 minutes.  Ex. A.  She immediately placed a

bright orange cone directly next to the spill.  *See id.*; *see also* Ex. B at 20.  Chytraus testified

that she placed the bright orange cone "right there [next to the spill] so nobody could get hurt."

Ex. B at 22:24; *see also id.* at 20:17.  She swept an approximately 3-foot area with a dustpan

and broom, and wiped the area down with paper towels which she left on the ground in a pile

next to the bright orange cone, to further denote that there was, or had been, a foreign

substance on the floor.  Ex. A; *see also* Ex. B at 25-26.  Chytraus visibly jogged around the

incident area as she swept and toweled.  Ex. A.

2.  Plaintiff's Admission Regarding Seeing Cone And Knowing Cone Was Displayed To
Indicate Presence Of A Spill On The Floor—Both Prior To Falling

Counsel for Walmart took Plaintiff's deposition on two separate days, with the second

day of questioning going forward on September 26, 2018, a little over a year after the alleged

incident.  *See* select/pertinent deposition testimony (Vol. II), attached hereto as **Exhibit C**.

During this second deposition session, counsel for Walmart showed Plaintiff the surveillance

footage of the incident and asked her questions regarding the same.  *See generally* Ex. C.  In

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 2

response to questions about whether she saw a cone on the floor prior to falling, Plaintiff

testified as follows:

> **Q.  Okay.  Do you recall seeing the cone on the floor?**
>
> A.  I remember seeing the cone, yes.
>
> **Q.  Before you fell?**
>
> A.  Yes.
>
> **Q.  You know that for sure?**
>
> A.  I think that I saw it, yeah.
>
> ….
>
> **Q.  Okay.  And just to be clear, you saw the cone before you slipped?  But you can't remember whether you saw the paper towels.[1]  Are both those statements correct?**
>
> A.  Correct.

Ex. C 263:9–15, 265:23–266:2; *see also id.* at 267:22.

Plaintiff admitted that she understood, before slipping, that the cone was in place to denote the

presence of a foreign substance on the floor.  *See* Ex. C at 263:22–23 ("I was thinking there

was something on the floor by the cone.").  In fact, she affirmed that she understood the cone

to indicate the presence of *a spill* on the floor, specifically.  *Id.* at 265.  Plaintiff further

admitted that while she perceived the cone, and believed it was there to indicate "there was

something on the floor," she nevertheless proceeded in the direction of the cone, within only a

---

[1] There was a pile of paper towels next to the cone, as further indication of the presence of something that either was, or had been, on the floor.  *See* Ex. B 28–30 (describing how and why paper towels were used, and why they remained on the floor at or around the time of the incident).

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 3

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

few feet of the cone, without looking at the floor. *See id.* at 266:23–24 ("I was not looking at the floor; that's what I said."); *see also id.* at 266:14–15, 267:15–18.

In addition to a bright orange cone, there was also a pile of paper towels on the ground, directly to the right of the cone—approximately six-to-eight inches to the right—from Plaintiff's point of view. *See* large-size color photographs of incident area immediately before spill, attached hereto as **<u>Exhibit D</u>**. Unlike the cone itself, which Plaintiff clearly testified that she saw repeatedly, Plaintiff was unsure as to whether she saw the pile of paper towels prior to falling. *See* Ex. C at 262:17–18 ("I don't remember. I think so. I don't remember.").[2] However, surveillance video shows that Plaintiff stepped within a foot or less of the paper towels before purportedly slipping:



*See* Ex. D (the above images are the same; the second is merely "zoomed in"). Plaintiff testified during her deposition that she did not remember stepping so close to the pile of paper towels, but agreed that her left foot appeared to be within "maybe 1 [foot]" of the towels based on reviewing the above images. Ex. C at 271:2–3. As one can see in these

---

[2] *Compare with* Ex. C at 263:11–13 ("I remember seeing the cone, yes [before the fall].").

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 4

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

images, stepping so close to the paper towels means that Plaintiff was within approximately 3 feet of the cone itself, which she saw prior to slipping, and understood to indicate the presence of a spill on the floor.  *See* Ex. D

## III.  STATEMENT OF ISSUES

Whether Walmart is entitled to summary judgment in a case where Plaintiff is seeking relief for allegedly slipping and falling on a spill on the floor she admits to being warned about, and where she further admits that she failed to look where she was walking, even though she perceived such a warning.

## IV.  EVIDENCE RELIED UPON

This motion is based upon the records and pleadings on file with the Court, as well as the Declaration of Eddy Silverman, Esq., attached hereto as Exhibit A.

## V.  LEGAL AUTHORITY

A.  <u>Standard: Motion For Summary Judgment</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FRCP 56.  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no "genuine" issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

B.  <u>Walmart Discharged Its Duty To Plaintiff By Successfully Warning Her Of The Condition She Claims Caused Her Injury</u>

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 5

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

For negligence claims based on premises liability, Washington has adopted the standards set forth in the Restatement (Second) of Torts, Sections 343 and 343A (1965), which deal with a landowner's liability to invitees. *Charlton v. Toys R Us—Delaware, Inc.*, 158 Wash. App. 906, 912–13 (Wash. Ct. App. 2010). Section 343 of the Restatement (Second) provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a)   Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b)   Should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c)   Fails to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343 (1965).

Subsection (a) above is referred to informally in Washington and elsewhere as "the notice requirement"; a landowner cannot be held liable for injuries resulting from dangerous conditions on his or her premises regarding which the landowner [1] has no actual knowledge, or [2] *could not have obtained* such knowledge "in the exercise of reasonable care." The latter type of notice can be referred to even more specifically as *constructive* notice ("should have known"). How Washington Courts define constructive notice is <u>the crucial part</u> of the Court's present's analysis, with respect to the dispositive issue before it, for the reasons that follow.

The Supreme Court of Washington, in *Ingersoll v. DeBartolo, Inc.*, 123 Wash. 2d 649 (1994) (en banc), defined constructive notice as follows:

> Constructive notice arises where the condition "has existed for such time as would have afforded [the proprietor] sufficient opportunity, in the exercise of ordinary care, to have made a proper

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 6

1

2

> inspection of the premises and to have removed the danger."  The plaintiff must establish that the defendant had, or should have had, knowledge of the dangerous condition <u>in time to [a] remedy the situation before the injury</u> ***or* [b] to warn the plaintiff of the danger**.

3

4

*Ingersoll*, 123 Wash. 2d at 652 (emphasis added).

5

6

Walmart submits that this definition of constructive notice is "the crucial part" of the

7

dispositive inquiry in this case because in *Ingersoll* et al., Washington Courts made clear that

8

<u>either</u> (a) "remedying" a potentially hazardous condition <u>or</u> (b) warning an invitee of the

9

condition dischargers a proprietor's duty.  *See Stimus v. Hagstrom*, 88 Wash. App. 286, 293

10

(Wash. Ct. App. 1997) (finding that Section 343 of the Restatement (Second) of Torts "implies

11

that the possessor of the property will take reasonable care to ascertain the actual condition of

12

the premises and will <u>either</u> [a] make it reasonably safe <u>or</u> give a warning of the condition and

13

its risks") (citing RESTATEMENT (SECOND) § 343 cmt. d).

14

> 1. <u>Walmart Successfully And Adequately Warned Plaintiff, But She Failed To Heed The Warning</u>

15

16

There is no dispute in this case as to the following material facts: (1) Plaintiff saw the

17

bright orange warning cone on the ground prior to falling[3]; (2) Plaintiff knew that the bright

18

orange cone denoted that there was a spill on the floor; (3) nevertheless Plaintiff proceeded

19

within only a few feet of the cone, without looking at the floor, and now claims to have

20

slipped, fallen, and injured herself.  On these facts, Walmart is entitled to summary judgment.

21

Discharge of duty to keep premises safe via adequate warning [as opposed to outright

22

hazard-elimination] is discussed most comprehensively and clearly in the directly-on-point,

23

persuasive decisions of other jurisdictions' Courts.[4]  *But see Helm v. Lowe's Home Ctrs., LLC,*

24

---

[3] Which Michelle Chytraus put out next to the spill, "right there[,] so nobody could get hurt."  Ex. B at 22:24.

25

[4] As already discussed, however, this concept, borne out of the Restatement (Second), has been discussed, adopted, and embraced by Washington Courts.  *See, e.g.*, Section V.B supra.  The fact remains, however, that at the present time, full explication of this concept is more prevalent in other jurisdictions.

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 7

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   2017 WL 2081077 (W.D. Wash. 2017) (granting summary judgment to Lowe's where plaintiff

2   slipped/tripped *on* a warning cone—notably, even where Lowe's "was unable to provide a

3   factually similar Washington authority"); *see also infra* PartV.B.2 (explicating *Helm*).

4          In one such on-point, persuasive case, *Golden Corral Corp. v. Trigg*, 443 S.W. 3d 515

5   (Tex. Ct. App. 2014) [hereinafter *Trigg*], the court reversed and rendered judgment in favor of

6   Golden Corral, finding that it had warned of the wet floor at issue and that the warning was

7   adequate to discharge its duty).  Notably, in the case, the plaintiff testified that she <u>did not see</u>

8   the warning before she fell.  *Id.* at 517.  Plaintiff did not contest that the sign was present, but

9   argued that the sign should have been placed where her foot slipped, and that the placement of

10  the sign several feet from where she fell allowed the jury to reasonably conclude that Golden

11  Corral's warning was inadequate.  *Id.* at 518.  The Texas Court of Appeals was not convinced,

12  noting that, like in Washington, premises owners and occupiers owe a duty to keep their

13  premises safe against known condition that pose unreasonable risks, but holding that this duty

14  is discharged by warning the invitee.  *Id.* (internal citations omitted).

15         In *Rowell v. Hollywood Casino Shreveport*, 996 So. 2d 476 (La. Ct. App. 2008), the

16  Louisiana Court of Appeals reached a similar result on similar facts.  In this case, the Court

17  affirmed summary judgment in favor of Hollywood Casino after noting that photographs of the

18  scene of the accident clearly showed a yellow caution cone "in close proximity" to where the

19  plaintiff fell.  *Id.* at 479.  <u>What the *Rowell* Court found "most significant," however, was that</u>

20  <u>plaintiff admitted to seeing the cone</u> upon entering the area where she fell (near the women's

21  restroom).  *Id.*[5]; *see also Eure v. Kroger Ltd. P'ship I*, 2012 WL 896347 (W.D. Va. 2012)

22  (granting defendant-store's motion for summary judgment where the store placed a yellow

23

24

25

---

[5] *See Rowell*, 996 So. 2d at 479 ("Most significantly, while Ms. Rowell may take issue with the exact location of the wet floor cone, she admits observing the wet floor warning upon entering the women's restroom.").

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 8

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

1   warning cone "in the middle of the spill area," which "was all that ordinary care required of

2   Kroger as a premises owner").

3       In *Pelland v. Wal-Mart Stores, Inc.*, 282 F. Supp. 3d 1019 (N.D. Ohio), which is

4   perhaps the most factually similar to the present case, the United States District Court for the

5   Northern District of Ohio granted summary judgment in favor of Walmart, the same store-

6   defendant as in the present case, where it was "undisputed that Wal-Mart [a] placed two

7   warning cones within a short distance of the spill, and [b] that [the plaintiff] saw these cones

8   and [c] understood what they signified." *Id.* at 1026.  "Nevertheless, [the plaintiff] returned to

9   the hazardous area and immediately slipped and fell." *Id.*  The evidence in the case revealed

10  that, at the time of her fall, two orange safety cones were "a few feet" in front of the plaintiff,

11  and yet she still "walked straight toward the caution cones." *Id.* at 1024.  The Court held that

12  "[f]aced with this undisputed evidence, a reasonable jury could conclude only that Wal-Mart

13  fulfilled its obligation to warn Pelland that the area near register 10 was wet and hazardous."

14  *Id.*; *C.f. Lapczynski v. Walmart Stores, Inc.*, 761 Fed. App. 530 (6th Cir. 2019) (granting

15  summary judgment to Walmart in a slip-and-fall case where orange caution cones displayed

16  rendered the risk of slipping on water on Walmart's tile floor "open and obvious").

17      The above survey of how other Courts rule when faced with strikingly similar facts

18  supports "the implication" coming out of the Restatement (Second), referenced by the

19  Washington Court of Appeals in *Stimus*, that warning of a potentially dangerous condition

20  discharges the premises owner's duty to invitees to keep premises reasonably safe, and that

21  placing cones within a few feet of a potentially hazardous condition constitutes adequate

22  warning.  Notably, the above cases support summary judgment when cones are placed *even*

23  *where the plaintiff denies ever seeing the cones*, simply based on the objective placement and

24  adequacy of the cone-placement.  The case at bar case presents a fairly unique situation in that

25  the Plaintiff in this case not only (a) saw the warning cone and (b) knew what the warning cone

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 9

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   meant, she (c) proceeded in the exact direction of the warning cone and allegedly fell victim to

2   the very hazard she admits she was informed regarding—again, most like the *Pelland* case

3   supra. So, "faced with this undisputed evidence," like in *Pelland*, a reasonable jury in this case

4   could reach only one conclusion too, that Walmart fulfilled its obligation to Plaintiff, and it is

5   for this and the other reasons discussed herein that summary judgment in proper in this case.

6       2.   <u>Plaintiff's Position Is Untenable Because It Would, Implicitly Or Otherwise, Impose A Legal Duty To Provide Visitors "Warning Upon Warning, *Ad Infinitum*"</u>

7

8         As discussed supra, Washington has not examined the discharge-of-duty-via-warning

9   issue as closely or directly as other jurisdictions. Perhaps the best and most comprehensive

10   examination of these sorts of issues is in *Helm v. Lowe's Home Ctrs., LLC*, 2017 WL 2081077

11   (W.D. Washington), another Western District case. *Helm* is noteworthy in that the Court there

12   granted summary judgment like in the extra-jurisdictional cases cited supra; however, the

13   Court did so pursuant to some fairly distinct, and unique reasoning—and in that the *Helm* case

14   involved a plaintiff who actually tripped *on a warning cone*, in a bit of irony.

15         The initial reasoning from the Court in the *Helm* decision reads like this Motion in that

16   the Court referenced the fact that Washington has adopted the Restatement (Second) and

17   Section 343 of the same specifically. *See Helm*, 2017 WL 2081077, at *2. The *Helm* decision

18   also reads like this brief insofar as the defendant there, Lowe's, was unable to provide a

19   factually similar Washington authority directly on point (but was able to find on point

20   authorities from other jurisdictions). Ultimately, in granting summary judgment to Lowe's, the

21   Court adopted the position of the persuasive Court, which had held that establishing a duty to

22   warn of a safety cone "invites us to impose on land possessors a legal duty to provide visitors

23   warning upon warning, *ad infinitum*." *Id.* (internal citations omitted). The *Helm* Court noted

24   that the plaintiff admitted that he saw the "bright yellow" cone before he tripped over it, and

25   thus concluded that the cone was an open and obvious marker, and that therefore any actual

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 10

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    danger of tripping over the cone could have been avoided by plaintiff exercising reasonable

2    care.  *Id.* at *3.  Thus, the Court concluded that Helm's position was "untenable."  *Id.*

3         Walmart hereby submits that the rationale in *Helm* is applicable to this case, and that

4    therefore Plaintiff's position here is equally "untenable."  Like in *Helm*, the Plaintiff in this

5    case admits that she saw a brightly colored warning cone before she slipped, *and* that she knew

6    why the cone was present (to indicate that a spill was, or had been on the floor).  Thus, like in

7    *Helm*, the cone was "an open and obvious warning marker."  Despite seeing the cone, however,

8    and knowing what it meant, the Plaintiff did not look where she was going and/or look at the

9    floor at all while she walked directly within a few feet of the cone.  So, like in *Helm*, one could

10   conclude that any danger of tripping could have been avoided <u>by Plaintiff</u> exercising

11   reasonable care.  And so finally, once again like in *Helm*, this case presents a kind of logical

12   quandary: if Plaintiff admits that saw the cone, knew of the danger, but ignored the warning

13   and allegedly fell victim to the danger as a result of that failure, *what more could Walmart do*

14   *under the circumstances to insulate itself from liability*?  This is a similar but different "ad

15   infinitum" situation wherein Walmart, as the possessor of land, seemingly cannot discharge its

16   duty in all of the ways allowed for in the Restatement (Second)—e.g., by clear warning,

17   adequately received and understood.

18   C.   <u>Walmart Is Not Liable To Plaintiff For Physical Harm Caused To Her By A Condition On</u>
19        <u>Land Whose Danger Was Known And/Or Obvious To Her</u>

20        Section 343A of the Restatement (Second) of Torts holds that a possessor of land is not

21   liable to his invitees for physical harm caused to them by a condition on the land whose

22   dangerous is known or obvious to them, unless the possessor should anticipate the harm despite

23   such knowledge or obviousness.  RESTATEMENT (SECOND) OF TORTS §343A(1).  Such reason to

24   "anticipate" harm even from known or obvious dangers may arise where, for example, the

25   possessor has reason to expect that the invitee's attention my be distracted, so that she will not

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

1  discover what is obvious.  *Id.*, cmt. f.  Incidentally, the remedy in a still-anticipated-harm

2  situation is, typically, to warn the invitee (which was done successfully in this case).  *See id.*

3       Although a land possessor is under a duty to his invitees, he is not ordinarily found

4  negligent for injuries to those from conditions that are open and obvious.  *Nowlan v. U.S.*, 73

5  F.3d 370 (9th Cir. 1995); *see also Kamla v. Space Needle Corp.*, 147 Wash. 2d 114, 127 (2002)

6  (en banc) (affirming trial court's dismissal on summary judgment grounded on finding that

7  "the defendant is not liable for plaintiff's failure to avoid an open, obvious potential hazard

8  about which he was aware and warned.").  Conditions that might not otherwise be "open and

9  obvious" can and do become so when invitees are warned about those conditions, and become

10  "knowledgeable" about them.  *See, e.g.*, *Lapczynski*, supra (concluding that the risk of slipping

11  on water was open and obvious by virtue of the placement of orange warning cones).

12       That the alleged dangerous condition in this case was known and/or "open and

13  obvious" to Plaintiff is undisputed.  Plaintiff saw a bright orange warning cone and "was

14  thinking there was something on the floor by the cone."  Ex. C at 263:22–23; *see also id.* at

15  265:10 (conceding that she understood the cone to mean that there was a spill on the floor,

16  specifically).  Now Plaintiff contended during her deposition that the spill was "far away [from

17  the cone]…when I was walking through," and claimed that she thought the spill was nearer to

18  the cone,[6] but the surveillance video simply does not support that Plaintiff walked "far away"

19  from where the cone was.

20       Surveillance video makes clear that Plaintiff walked with only a few feet of a cone she

21  knew indicated the presence of a spill on the floor—and within mere inches of a pile of paper

22  towels.  Plaintiff may try to argue that Walmart had some sort of heightened duty to her under

23  the circumstances and/or that Walmart should have done more "in anticipation of harm"

24  despite the obviousness of the condition at issue; however, as alluded to above, the typical

25

---

[6] *See* Ex. C at 264:22–265.

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 12

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

1    remedy in a still-anticipated-harm situation is a warning,[7]  which Plaintiff undisputedly

2    received, absorbed, and understood. This analysis is therefore not applicable to the instant

3    situation because there is no dispute that Plaintiff was acutely and expressly aware of the

4    condition at issue.  And so any argument that Walmart "should have done more" is unavailing,

5    and so, under Restatement (Second) of Torts § 343A, Walmart is not liable to Plaintiff for

6    physical harm caused to her by a condition on land whose dangerous was known and/or

7    obvious to her.

8    D.   <u>Whether Or Not There Was Still Foreign Material On The Ground Is Immaterial To The
         Dispositive Issue</u>

9

10          Plaintiff can and will quibble about the adequacy of the clean-up of the spill—Plaintiff

11   will try to draw the focus of the summary judgment argument there, but this is wrong and

12   misleading, and so it is important that the Court mind the distinction between (a) remedying

13   versus (b) warning in the context of potentially or allegedly dangerous conditions—<u>two

14   separate ways to discharge duty</u>.  Focus on the former misses the heart of the dispositive issue

15   that is the basis of Walmart's Motion for Summary Judgment.

16          Washington cases make clear that there are not one but *two* avenues available to a

17   premises owner to discharge his or her duty to invitees where there is a dangerous condition on

18   the premises: (1) remedy the dangerous condition, i.e. remove it, <u>*or*</u> (2) warn the invitee that

19   the potentially dangerous condition exists.  *See, e.g.*, *Tincani v. Inland Empire Zoological Soc.*,

20   124 Wash. 2d 121, 138–40 (1994) (en banc) (discussing landowner's duties to warn invitees,

21   and referring to alternative responsibilities, grounded in the restatement, "to [a] warn of, or [b]

22   make safe a known or obvious danger").

23

24

25

---

[7] The idea here is making sure a specific invitee is made expressly aware of a potentially dangerous condition that might be obvious to others but not to the specific invitee for some particular reason, which is plainly not at issue here, because Plaintiff *was* aware of the potentially dangerous condition at issue.

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 13

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

## VI.  CONCLUSION

The Plaintiff in this case, in her own words, admitted that she saw a warning sign, knew what it meant, ignored the warning, and fell victim to the condition the warning was designed to guard against.  In light of these undisputed facts, a reasonable jury could only conclude that it was Plaintiff's failure to exercise reasonable care, and not Walmart's, that proximately caused any fall and/or resulting damages.  These facts are not merely the basis for comparative negligence in a case like this[8]; they establish, as a matter of law, that Walmart effectively and undisputedly discharged its duty to Plaintiff as defined in the Restatement (Second), and under Washington law, to remedy a hazard *or* warn of it.  Based on and in light of the foregoing, Walmart respectfully requests that this Court grant Walmart's Motion for Summary Judgment.

DATED this 23rd day of October, 2019.

WILLIAMS, KASTNER & GIBBS PLLC


By  *s/Eddy Silverman*
    Rodney L. Umberger, WSBA No. 24948
    Eddy Silverman, WSBA No. 53494

Two Union Square
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Phone:  206.628.6600
Fax:      206.628.6611
Email:  rumberger@williamskastner.com
      esilverman@williamskastner.com

*Counsel for Defendant Walmart Inc.*

---

[8] *Compare* RESTATEMENT (SECOND) OF TORTS § 343A, cmt. f (describing unique situation in which a possessor of land has reason to expect than an invitee will proceed to encounter even known or obvious danger because the advantages outweigh the apparent risk, in which cases "the fact the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence, or assumption of risk….[but not] conclusive in determining the duty of the possession, or whether he has acted reasonably under the circumstances.").  In other words, landowners are not liable when plaintiffs are injured by dangerous conditions known or obvious to those individuals, and this is a dipositive, duty-absolving issues, *except in and under* the unique circumstances outlined supra in this note and in comment "f" to the Restatement (Second) § 343A.

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 14

6969563.1

1

## <u>CERTIFICATE OF SERVICE</u>

2

The undersigned certifies under penalty of perjury under the laws of the State of

3

Washington that on the date indicated below, I caused service of a true and correct copy of the

4

foregoing document in the manner indicated below to:

5

6

7

8

9

Thomas J. West, WSBA No. 5857
WEST LAW FIRM, P.S.
524 Tacoma Avenue South
Tacoma, WA 98402
Phone: 253.383.4704
Fax:    253.383.7244
Email: tom@westlawtacoma.com
         heather@westlawtacoma.com
*Attorney for Plaintiff*

☐ U.S. Mail
☐ E-mail, *per E-Service Agreement 9/19/18*
☑ CM/ECF
☐ Hand Delivery/Legal Messenger
☐ Facsimile

10

11

Signed at Seattle, Washington this 23rd day of October, 2019.

12

WILLIAMS, KASTNER & GIBBS PLLC

13

By  *s/Jaimisha Steward*
    Jaimisha Steward, Legal Assistant

14

15

16

17

18

19

20

21

22

23

24

25

WALMART INC.'S MOTION FOR SUMMARY JUDGMENT - 15

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6969563.1

# Exhibit A

1

2

3                                                        The Honorable Richard A. Jones
                                                         Trial Date: January 21, 2020
4

5

6

7                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
8                                     AT SEATTLE

9    ARCELIA H. POWERS, a single woman,          NO. 2:18-cv-01883-RAJ

10                      Plaintiff,               DECLARATION OF EDDY
                                                 SILVERMAN, ESQ., IN SUPPORT OF
11         v.                                    MOTION FOR SUMMARY JUDGMENT

12   WALMART, INC., a foreign corporation, dba
     MT. VERNON WALMART, Store #2596,
13
                        Defendant.
14

15         I, Eddy Silverman, Esq., hereby declare and say:

16         1.      That I am an attorney at the law firm of WILLIAMS, KASTNER & GIBBS

17   PLLC, and I am licensed to practice law in this Court.

18         2.      I am over the age of eighteen and a U.S. citizen.  I have personal knowledge of

19   the facts referred to in this Declaration and could competently testify to these facts if called

20   upon to do so in a court of law.

21         3.      Along with Rodney Umberger, I represent Defendant WALMART INC.

22   ("Walmart") in the above captioned matter, and I am making this Declaration in support of

23   Walmart's Motion for Summary Judgment ("Motion").

24         4.      The events in question out of which the above referenced lawsuit arises were

25   captured in full by Walmart surveillance cameras, meaning (a) the customer spill, (b) spill

DECLARATION OF EDDY SILVERMAN, ESQ., IN SUPPORT OF        **Williams, Kastner & Gibbs PLLC**
MOTION FOR SUMMARY JUDGMENT - 1                           601 Union Street, Suite 4100
                                                          Seattle, Washington 98101-2380
                                                          (206) 628-6600

6970095.1

1   clean-up by Walmart associate Michelle Chytraus, and (c) Plaintiff's fall were all captured on

2   video.  My office produced a copy of this surveillance video to Plaintiff's counsel, and showed

3   Plaintiff the video during the second day of deposition questioning of her (her deposition took

4   place over two days).  In this video, one can see a young child customer, checking out with her

5   mother, drop an item to the floor at approximately 3:33.45 p.m. on the date of the incident.

6   Michelle Chytraus begins walking towards the area of the spill at approximately 3:34:36, less

7   than a minute after the spill.  Chytraus places a bright orange cone next to the dropped item at

8   approximately 3:35:13.  She then proceeds to sweep the area with a dustpan and broom, and

9   clean and dry the floor with paper towels.  Chytraus leaves a pile of paper towels next to the

10  cone before leaving the demarcated area to continue assisting customers.  Plaintiff's purported

11  slip and fall occurs at approximately 3:38:42 p.m., almost five minute exactly after the spill at

12  issue.  The foregoing is a truthful and accurate recounting of the surveillance video in this case,

13  which Walmart can and will produce at the Court's request.

14      5.    This declaration is identifiable as **Exhibit A** to Walmart's Motion.

15      6.    Attached hereto as **Exhibit B** are true and complete excerpts from a certified

16  copy of the deposition transcript of Michelle Chytraus related to the above referenced matter.

17      7.    Attached hereto as **Exhibit C** are true and complete excerpts from a certified

18  copy of the deposition transcript of Plaintiff Arcelia Powers (Vol. II) related to the above

19  referenced matter.

20      8.    Attached hereto as **Exhibit D** are true and accurate screenshots captured from

21  the surveillance video in this case.

22      I declare under penalty of perjury under the laws of the United States and of the State of

23  Washington that the foregoing is true and correct.

24

25

DECLARATION OF EDDY SILVERMAN, ESQ., IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 2

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1    DATED this 23rd day of October, 2019.

2

3

4                                              By *s/Eddy Silverman*
                                                  Eddy Silverman, WSBA No. 53494

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF EDDY SILVERMAN, ESQ., IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 3

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

6970095.1

# Exhibit B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------------------------------

ARCELIA H. POWERS, a single woman, )
                                   )
                Plaintiff,         )
                                   )
    vs.                            ) No. C18-1883 RAJ
                                   )
WALMART, INC., a foreign           )
corporation, dba MT. VERNON        )
WALMART, Store #2596,              )
                                   )
                Defendant.         )
------------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

MICHELLE CHYTRAUS fna MICHELLE FINCHUM

------------------------------------------------------------

March 13, 2019

Seattle, Washington


* * * * * * *



REPORTED BY:

Allison O'Brien, CCR No. 2163

3641 N. Pearl Street, #D

Tacoma, WA 98407

(253) 627-2062

Page 20

1    Q.   Okay.  When you say a bright orange flag, what are

2  you --

3    A.   Or excuse me.  A cone.  It was a cone.

4    Q.   Yeah, I don't remember seeing a flag.

5    A.   No.

6    Q.   So there was a cone right there underneath one of

7  the counters where you were working, correct?

8    A.   I looked for it, yes, because it was.

9    Q.   Okay.

10   A.   It was in there, yes.

11   Q.   All right.  How long did it take you to find it?

12   A.   Not very long.

13   Q.   Okay.  A few seconds?

14   A.   Yeah.

15   Q.   All right.  And then after you found the orange

16  cone, what did you do?

17   A.   I put it out next to the spill.

18   Q.   Okay.  And the spill we're talking about, what was

19  the size of the spill?  Was it the size of -- you know, a

20  foot wide, or was it just contained within the bottle to

21  some extent?  How would you describe it in terms of size?

22   A.   It was one of the little jars.

23   Q.   Right.

24   A.   And it had fallen, okay?  So it was little.  And

25  then it had -- the glass had broken a little bit and it had

Page 22

1   it just in one direction that it was 2 feet and the rest was

2   say, you know, 6 inches?  I mean, I don't know.  I'm just

3   trying to get an idea of what the shape of the spill was, if

4   you remember.  I realize it was a long time ago.

5        A.   Right.  It seemed to go more towards where my

6   counter was.

7        Q.   Okay.  All right.  So it was -- it was a -- it was

8   a 2-inch -- or 2 feet long, but it wasn't as wide?

9        A.   No, I wouldn't say it was 2 feet long, no.  It was

10  in the area, and it had splatted.

11       Q.   Okay.  Had it splatted in a 2-feet -- 2-foot

12  circle?

13       A.   When I say splatted, I meant like it just -- there

14  was some broken glass, but there was dots.  So it wasn't

15  like a 2-foot big smear mess, no.

16       Q.   Okay.  All right.  So most of it was clumped

17  together in one particular area?

18       A.   Right, yeah.

19       Q.   And then little splatters outside that?

20       A.   A couple, yes.

21       Q.   Okay.  So you went over there and you put the cone

22  down next to the -- where it was.  How far was the cone from

23  the splattered area?

24       A.   It was right there so nobody could get hurt.

25       Q.   When you say right there, was it on top of it or

Page 25

1    A.   Paper towels.

2    Q.   All right.  So what did you do first when you

3  gathered up the paper towels that you had?  And by the way,

4  did you have to go somewhere else to get paper towels?

5    A.   I had to go up to where my station was.

6    Q.   And how far is that from the splatter?

7    A.   I'd guess 10 feet maybe.

8    Q.   Okay.  So again, just a matter of a few seconds

9  for you to get that?

10    A.   Right.

11    Q.   Okay.  So did you go get the broom and the dustpan

12  and then go over and get the paper towels, or vice versa?

13    A.   No, I did the -- I got the broom and dustpan and

14  cleaned it up first.

15    Q.   Okay.  And so you're cleaning up the glass and --

16    A.   Correct.

17    Q.   -- whatever goop that was there that would come up

18  with it.  In other words, most of the substance of the spill

19  is what you were trying to pick up?

20    A.   Yes, correct.

21    Q.   Okay.  But even with that, after that, there's

22  still stuff on the floor that you needed to clean up,

23  correct?

24              MR. SILVERMAN:  Objection to form.

25    A.   No.  It was cleaned up.  It was just a wet mark.

Page 26

1    Q.   A wet mark?

2    A.   Right.

3    Q.   Okay.  So with the -- with the broom -- just so I

understand, with the broom and the dustpan, you were able to

5    get all the baby food and the glass cleaned up and into the

6    dustpan and the only thing left after you did that was what

7    again?

8    A.   There was -- it's like when the rain hits cement.

9    There's a wet mark.

10   Q.   Okay.

11   A.   Okay.  Because it was cement.  So that's why I

12   went and got the paper towels.

13   Q.   Well, I understand.  But the baby food is not

14   rain.  Baby food is a different substance, correct?

15   A.   Right.

16   Q.   Okay.

17   A.   Correct.

18   Q.   So, but nonetheless you're indicating that

19   basically there's a wet mark there, correct?

20   A.   Yes.

21   Q.   Okay.  And by wet mark, are you including the area

22   where the splatter was that was 2 feet apart?

23   A.   Yes.

24   Q.   Okay.  So we're dealing with a wet mark, as you've

25   described it, that's roughly 2 feet long and maybe not as

Page 28

1   set that up, okay?  And then I helped a gentleman or a

2   woman -- I helped somebody with alcohol.

3       Q.   Well, let me ask just so I can set the time frame

4   on this correctly.

5       A.   Okay.

6       Q.   When you're talking about you -- you were doing

7   other things, are you talking about doing other things

8   before you wiped up the area with the paper towel, or after?

9       A.   I took care of -- I believe I took care of the

10  mess, and then --

11      Q.   Well, wait.  Could you answer my question?

12      A.   Okay.

13      Q.   First we start out with the broom and the dustpan?

14      A.   Right.

15      Q.   And then you take the dustpan full of the stuff --

16      A.   Right.

17      Q.   -- and you take it and you dump it in a garbage

18  pail somewhere, correct?

19      A.   Into a box.

20      Q.   Into a box?

21      A.   Correct.

22      Q.   Okay.  And then what did you do?  Did you go --

23  let me ask you this:  Did you then immediately go get the

24  paper towels?

25      A.   Yes.

Page 29

1    Q.    And then go immediately to the spill area and wipe

2    up what you thought was the rest of the spill?

3    A.    Correct.

4    Q.    Okay.  And so between the time you started

5    cleaning the mess, you didn't stop to do anything else, if

6    you recall?

7    A.    Right.  I didn't leave that area until I felt

8    safe.

9    Q.    Okay.

10    A.    That everybody else would feel safe, you know.

11    Q.    All right.  So basically what -- what did you do

12    with the paper towels when you were done wiping up the area?

13    A.    I left them there.

14    Q.    Okay.

15    A.    So that people would know that Maintenance was on

16    the way just to -- now, okay.  I had cleaned it, okay?  You

17    have to call Maintenance.  And had I taken the -- the orange

18    cone away, Maintenance wouldn't have known where to go,

19    okay?  So I left that out as -- so Maintenance would know

20    exactly where to clean and that nobody would walk within

21    that area.  It was not slippery, okay?  Hazmat would be dish

22    soap, detergent, that sort of thing, where you need what's

23    called Spill Magic.  It didn't need it because it was not a

24    slippery substance.

25    Q.    Okay.  So after you wiped up the spill with the

Page 30

1   paper towel and left the paper towel in that area, was it --

2   did you leave the paper towel next -- was it on the spill

3   area itself, or did you put it next to the cone?

4              MR. SILVERMAN:  Objection to form.

5        Q.   In other words, the area that you cleaned up, did

6   you leave the paper towels over the area that you cleaned

7   up, or did you take the paper towels and move them to an

8   area next to the cone, if you recall?

9              MR. SILVERMAN:  Same objection.

10       A.   I left it over where the mark was.

11       Q.   Okay.  So you -- you left the paper towels over

12  the area that you had cleaned up; is that right?

13       A.   I believe.

14       Q.   You believe, okay.

15  Have you seen the video of this incident?

16       A.   I have.

17       Q.   When did you see it?

18       A.   Oh, I saw it last week.

19       Q.   Okay.

20       A.   And I saw it like a month ago.

21       Q.   Okay.  So you've seen it last week and a month

22  ago?

23       A.   Correct.

24       Q.   And your recollection is that what you did is you

25  put the paper towels on the area that would otherwise be

DEPOSITION OF MICHELLE CHYTRAUS, 03-13-19

Page 60

1                     CERTIFICATE

2    STATE OF WASHINGTON )

                        ) ss.

3    COUNTY OF KING      )

4        I, the undersigned Washington Certified Court Reporter,

5    pursuant to RCW 5.28.010 authorized to administer oaths and

6    affirmations in and for the State of Washington, do hereby

7    certify:

8        That the annexed and foregoing deposition consisting of

9    page 1 through 59 of the testimony of each witness named

10   herein was taken stenographically before me and reduced to a

11   typed format under my direction;

12       I further certify that according to CR30(e) the witness

13   was given the opportunity to examine, read and sign the

14   deposition after the same was transcribed, unless indicated

15   in the record that the review was waived;

16       I further certify that all objections made at the time

17   of said examination to my qualifications or the manner of

18   taking the deposition or to the conduct of any party have

19   been noted by me upon each said deposition;

20       I further certify that I am not a relative or employee

21   of any such attorney or counsel, and that I am not

22   financially interested in the said action or the outcome

23   thereof;

24       I further certify that each witness before examination

25   was by me duly sworn or affirmed to testify the truth, the

DEPOSITION OF MICHELLE CHYTRAUS, 03-13-19

Page 61

1    whole truth, and nothing but the truth;

2         I further certify that the deposition, as transcribed,

3    is a full, true and correct transcript of the testimony,

4    including questions and answers, and all objections, motions

5    and exceptions of counsel made and taken at the time of the

6    foregoing examination and was prepared pursuant to

7    Washington Administrative Code 308-14-135, the transcript

8    preparation format guideline, to the best of my ability;

9         I further certify that I am sealing, or causing to be

10   sealed, the deposition in an envelope with the title of the

11   above cause and the name of the witness visible and I am

12   delivering the same to the appropriate authority.

13        I further advise you that as a matter of firm policy,

14   the stenographic notes of this transcript will be destroyed

15   three years from the date appearing on this certificate

16   unless notice is received otherwise from any party or

17   counsel thereto on or before said date.

18        IN WITNESS WHEREOF, I have hereunto set my hand and

19   affixed my Washington State CCR seal March 19, 2019.

20

21                         /s/ Allison O'Brien

                         _____

22                         Allison O'Brien
                         Certified Court Reporter No. 2163

23                         in and for the State of Washington,
                         residing at Seattle, Washington.

24

25

# Exhibit C

1              SUPERIOR COURT OF THE STATE OF WASHINGTON

2                          SKAGIT COUNTY

3    _____

     ARCELIA H. POWERS, a single    )
4    woman,                         )
                                    )
5                   Plaintiff,      )
                                    )
6    vs.                            ) No. 18-2-00337-29
                                    )
7    WALMART, INC., a foreign       )
     corporation, dba MT. VERNON    )
8    WALMART, Store #2596,          )
                                    )
9                   Defendant.      )
     _____

10            DEPOSITION UPON ORAL EXAMINATION OF

11                     ARCELIA H. POWERS

12                      VOLUME 2 of 2

13   _____

14

15

16                        9:23 A.M.

17             WEDNESDAY, SEPTEMBER 26, 2018

18               524 TACOMA AVENUE SOUTH

19                  TACOMA, WASHINGTON

20

21

22

23

24   Reported by:  Tami Lynn Vondran, RPR, CCR No. 2157

25   Job No.: 498903

Page 262

```
 1   you -- is it --
 2        A.   Looks like, yeah.
 3        Q.   It looks like, yes, you are looking to your
 4   right slightly?
 5        A.   Right.
 6        Q.   Okay.  Is that your recollection that you were
 7   looking to your right for some reason at or around this
 8   point in time?
 9        A.   No.
10        Q.   Do you recall whether you were looking to your
11   right because you were talking to Charles Lloyd here?
12        A.   I think -- I'm not sure.  I think that I was
13   looking at -- you know, sometimes people leave the
14   baskets by the cashier, so I was looking for a basket.
15        Q.   Okay.  Do you recall seeing the paper towels
16   on the floor before you slipped?
17        A.   I don't remember.  I think so.  I don't
18   remember.
19        Q.   Okay.  You said two different things there
20   though, so we need to try to make sure that we've got
21   your answer.
22        A.   I don't remember.
23        Q.   You don't remember?
24        A.   No.
25        Q.   Okay.  At first you said, "I think so."  What
```

Page 263

1  made you say that?

2      A.   You know, when they -- when something happened

3  to you like that --

4      Q.   **Yeah.**

5      A.   -- it's too quick to, you know -- to notice

6  everything.

7      Q.   **Yeah.**

8      A.   So that's why I said, "I don't remember."

9      Q.   **Okay.  Do you recall seeing the cone on the**

10  **floor?**

11      A.   I remember seeing the cone, yes.

12      Q.   **Before you fell?**

13      A.   Yes.

14      Q.   **You know that for sure?**

15      A.   I think that I saw it, yeah.

16      Q.   **Okay.  What were you thinking when you saw the**

17  **cone?  What did that suggest to you?**

18      A.   That there was something on the floor.

19      Q.   **Okay.  So you knew there was something on the**

20  **floor before you entered what I'll refer to as the**

21  **incident area; is that correct?**

22      A.   Well, I was thinking there was something on

23  the floor by the cone.

24      Q.   **Okay.**

25      A.   Not where I walked by.

Page 264

1        Q.    Okay.  Did you -- do you believe that you took

2    extra care when you were walking through the area

3    because you knew that there was something on the floor?

4              MR. WEST:  Object --

5        A.    I --

6              MR. SILVERMAN:  Let him get his objection in.

7              MR. WEST:  Object to the form.

8        A.    I always care, you know.  I always care when

9    I'm walking.  But it was oil.  So oily, the floor, so...

10       Q.    (BY MR. SILVERMAN)  I'll pause -- I'll present

11   it to you this way.

12             If I was walking and I saw a "caution, wet

13   floor" sign or something like that, I might be more

14   careful --

15       A.    Careful.

16       Q.    -- thinking that the floor was wet.

17             Would you say that that was the way you were

18   acting when you saw the cone in this case?

19             MR. WEST:  Object to the form.

20       A.    Like I said, the cone was far away from what I

21   was walking by.

22       Q.    (BY MR. SILVERMAN)  So does that mean that you

23   were not being extra careful, so to speak, when you were

24   walking through the area because you thought the spill

25   was nearer to the cone?

Page 265

1          MR. WEST:  Object to the form.

2          You can answer.

3     A.   I don't know what to say about that.

4     Q.   (BY MR. SILVERMAN)  I'm trying to understand

5  what your mindset was.  So, for example, here, you've

6  said to me, "Eddy, I saw the cone"; right?

7     A.   (Nodding.)

8     Q.   And then you've said, "I thought the spill was

9  closer to the cone"; right?

10    A.   Right.

11         MR. WEST:  Object to the form.

12    Q.   (BY MR. SILVERMAN)  What I'm trying to

13 understand is when you saw the cone, was there any part

14 of your -- or were you thinking to any extent, I should

15 be more careful now because there's a spill in this

16 area?

17         MR. WEST:  Object to the form.

18    A.   Yes, but it was far away from us when I was

19 walking through.

20    Q.   (BY MR. SILVERMAN)  You thought where you were

21 walking there would not be an issue there?

22    A.   That's right.

23    Q.   Okay.  And just to be clear, you saw the cone

24 before you slipped?  But you can't remember whether you

25 saw the paper towels?  Are both those statements

ARCELIA H.  POWERS, VOLUME II  - 09/26/2018

Page 266

1    correct?

2        A.    Correct.

3        Q.    Would you say you were watching where you were

4    walking immediately prior to the accident?

5             MR. WEST:  Object to the form.

6        A.    You know, I was looking for a basket.  I was

7    not looking at the floor.

8        Q.    (BY MR. SILVERMAN)  Okay.  So you were not

9    watching where you were walking?

10            MR. WEST:  Object to the form.  Argumentative.

11       Q.    (BY MR. SILVERMAN)  It's not argumentative.

12   I'm just trying to understand.  I said, "Were you

13   watching where you were walking?  You said, "I was" --

14       A.    I was not looking at the floor, no, I was

15   looking for a basket.

16       Q.    Okay.  And, again, I'm not trying to be

17   argumentative.  I'm trying to pin down your answer.

18            I said, "Were you watching where you were

19   walking?"

20            You said, "I was watching -- I was looking for

21   a basket."  So to me it's suggesting the answer to my

22   question, no.  How would you answer?

23       A.    I was not looking at the floor; that's what I

24   said.

25       Q.    Okay.

ARCELIA H.  POWERS, VOLUME II  - 09/26/2018

Page 267

1      A.   I was careful because I always be careful, but

2   I was not looking at the floor.

3      Q.   **You know what I mean though.  If I'm looking**

4   **where I'm walking, I'm looking in the path that I'm**

5   **walking.  Does that make sense?**

6           MR. WEST:  Object to the form.

7      A.   Yes.

8      Q.   **(BY MR. SILVERMAN)  So were you watching or**

9   **looking where you were walking immediately prior to the**

10  **accident in this case?**

11          MR. WEST:  Object to the form.

12          You can answer.

13     A.   (Shaking head.)

14     Q.   **(BY MR. SILVERMAN)  You're shaking your head.**

15     A.   Like I said, I was not looking at the floor.

16     Q.   **You were not looking where you were walking?**

17          MR. WEST:  Object to the form.

18     A.   No, I was looking for a basket.

19     Q.   **(BY MR. SILVERMAN)  Okay.**

20     A.   So I didn't look at the floor.

21     Q.   **Okay.**

22     A.   I saw the cone.  But like I said, it was away

23  from the -- what I was going through.

24     Q.   **Okay.  I'm going to skip ahead a little bit**

25  **here.**

ARCELIA H.  POWERS, VOLUME II  - 09/26/2018

Page 271

1    A.   In the video it looks closer than 2 feet.

2    **Q.   Do you believe it's closer than 1 foot?**

3    A.   Maybe 1.

4    **Q.   Okay.**

5         MR. WEST:  And we're still speaking about the

6    left leg?

7         MR. SILVERMAN:  Yes, the leg that's forward in

8    the frame here.

9         MR. WEST:  Right.  When she's starting to

10   fall?

11        MR. SILVERMAN:  Yes.

12        MR. WEST:  Okay.

13   A.   Because my leg -- my left leg went to the

14   side.  And if it was that close --

15   **Q.   (BY MR. SILVERMAN)  Yeah.**

16   A.   -- my leg was going to touch that paper

17   towels.

18   **Q.   Do you remember which foot it was, your left**

19   **or your right, that slipped out from underneath you?**

20   A.   The left one.

21   **Q.   Okay.  So it was your left foot that slipped?**

22   A.   My left one went to the side and the right one

23   went to the floor.

24   **Q.   Do you believe that what we're looking at here**

25   **is the moment where your left foot slips?  And I could**

ARCELIA H.  POWERS, VOLUME II  - 09/26/2018

Page 325

1                    REPORTER'S CERTIFICATE

2

3          I, TAMI LYNN VONDRAN, the undersigned Certified

4    Court Reporter, pursuant to RCW 5.28.010, authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify that the sworn

7    testimony and/or proceedings, a transcript of which is

8    attached, was given before me at the time and place

9    stated therein; that any and/or all witness(es) were

10   duly sworn to testify to the truth; that the sworn

11   testimony and/or proceedings were by me stenographically

12   recorded and transcribed under my supervision, to the

13   best of my ability; that the foregoing transcript

14   contains a full, true, and accurate record of all the

15   sworn testimony and/or proceedings given and occurring

16   at the time and place stated in the transcript; that a

17   review of which was not requested; that I am in no way

18   related to any party to the matter, nor to any counsel,

19   nor do I have any financial interest in the event of the

20   cause.

21          WITNESS MY HAND AND DIGITAL SIGNATURE THIS 5th

22   day of October, 2018.

23

24   _____
     TAMI LYNN VONDRAN, CCR, RPR
25   Washington State CCR No. 2157

# Exhibit D









ACTION_ALLEY_FRONT